IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 4, 2018

## IN RE LARRY P. ET AL.

**Appeal from the Juvenile Court for Wilson County**
**No. 16JT9     Charles B. Tatum, Judge**

_____

### No. M2018-00466-COA-R3-PT

_____

The juvenile court terminated the parental rights of the mother on grounds of abandonment by willful failure to support, abandonment by willful failure to visit, and persistence of conditions and found that termination was in the best interest of the two children. On appeal, we find that clear and convincing evidence supports all three grounds as well as the trial court's best interest determination. We, therefore, affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and JOHN W. MCCLARTY, J., joined.

W. Michael Kilgore, Mount Juliet, Tennessee, for the appellant, Tara A.P.

Herbert H. Slatery, III, Attorney General and Reporter, and Erin A. Shackelford, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

Tara A.P. ("Mother") is the mother of Larry W.P., III, born in September 2007, and Kimberly A.P., born in July 2009. The father of these two children, Larry W.P., Jr. ("Father"), died in December 2009.

The Department of Children's Services ("DCS" or "the Department") first became involved with Mother and the two children in July 2014 based on allegations that Mother and her boyfriend, Bryan L., were exposing the children to the manufacture and use of

methamphetamines in the family residence. Mother submitted to a drug screen, which was negative for all substances. Bryan L. refused to submit to a drug screen. The Department discovered that Bryan L. had an open case with DCS and was concerned about his refusal to complete a drug screen. Mother agreed to work with the Department to develop a safety plan for the children. The Department filed a petition for a restraining order in Wilson County juvenile court, alleging that the children were dependent and neglected and asking the court to restrain all contact between Bryan L. and the children.

At the time of the preliminary hearing on September 8, 2014, Mother was in jail in Rutherford County. The children were placed in the temporary custody of their maternal grandfather, James K., and the hearing was reset for September 15, 2014. When the parties appeared in court again on November 10, 2014, Mother waived the adjudicatory hearing and stipulated to a finding of dependency and neglect based upon her failure to protect the children as alleged in the Department's petition and her subsequent incarceration. In an order entered on January 9, 2015, the court determined that the children would remain in the protective custody of the court, but full legal and physical custody was restored to Mother. The court further ordered that there be no contact between Bryan L. and the children.

On April 15, 2015, DCS received a referral alleging that Mother and Bryan L. were using methamphetamines in the family residence and that multiple people came in and out of the residence to use methamphetamines. Mother eventually admitted that Bryan L. had been in the home. She agreed to submit to a drug screen, but was unable to produce a urine sample despite having several hours to do so. Mother agreed to sign a document for the children to be cared for by her father, James K. As a result of its investigation, DCS filed a petition on April 24, 2015, to transfer temporary legal custody of the children to James K. based upon dependency and neglect and severe abuse. At a hearing on April 27, 2015, the court ordered Mother to pay $60.00 per week in child support, beginning May 4, 2015, to the Central Child Support Unit.

At a hearing on June 15, 2015, the court found the children dependent and neglected and determined that there was no less drastic alternative to removal. James K. was no longer a viable placement, partly because of Mother's failure to pay court-ordered support, and the children were placed in the legal and physical custody of DCS. All contact between Mother and the children was suspended until she completed the required alcohol and drug assessments and resulting recommendations and had three consecutive clean drug screens. A guardian ad litem represented the children.

The Department developed a permanency plan for Mother and the children on June 30, 2015, and the court ratified the plan on July 27, 2015. Under the plan, Mother's responsibilities, in addition to paying child support, included completing an alcohol and drug ("A&D") assessment and following all recommendations; completing a clinical intake and following all recommendations; completing a parenting assessment and

following all recommendations; ensuring that there was no contact between Bryan L. and the children; obeying all laws; complying with all rules of probation, if applicable; succeeding in not incurring any new charges but, if she did incur new charges, notifying the Department immediately; maintaining steady, verifiable employment for at least four consecutive months, and providing verification (pay stubs) to the Department; and maintaining a residence for four consecutive months, and providing verification (proof of residence) to the Department.

The Department filed a petition to terminate Mother's parental rights on June 29, 2016. According to the petition, Mother was "presently residing in hotels." The Department sought termination of Mother's parental rights on the following grounds: (1) abandonment by failure to visit pursuant to Tenn. Code Ann. § 36-1-113(g)(1); (2) abandonment by failure to provide a suitable home pursuant to Tenn. Code Ann. § 36-1-113(g)(1); (3) abandonment by failure to support pursuant to Tenn. Code Ann. § 36-1-113(g)(1); (4) substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2); and (5) persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3). The petition further alleges that termination is in the children's best interests.

On August 16, 2017, the guardian ad litem filed a motion to restrict Mother's visitation. According to the motion, Mother had been exercising therapeutic visitation with the children for several months.[1] However, she tested positive for methamphetamines on August 3, 2017, and for suboxone on August 8, 2017. She had been dismissed from her rehabilitation program and halfway house in July 2017 for alcohol use. On August 16, 2017, the juvenile court entered an ex parte restraining order prohibiting Mother from having any contact with the children until further order of the court. A hearing was set for August 23, 2017.[2]

Termination hearing

The termination petition was heard by the juvenile court on October 25 and December 21, 2017. The trial court heard testimony from both children in chambers. Kimberly was in third grade; Larry was in fifth grade. They were living with foster parents Michelle and Shane J.

Mother testified that, when DCS investigated in April 2015, Bryan L. was living with her again. On June 15, 2015, the children were placed in DCS legal and physical custody. Mother testified that she was still using drugs—opiates and

---

[1] Mother was unable to see the children for over a year due to the juvenile court's order prohibiting her from contact until she went through drug and alcohol assessment and had three clean drug screens.

[2] The record contains no other orders on this matter.

- 3 -

methamphetamines—at that time, and that she was living with Bryan L. She acknowledged that Bryan L. was the father of another of her children, Evelyn, about whom there was a separate DCS case in Rutherford County. She testified that her children had been in DCS custody continuously since April 2015 and that she knew she had an obligation to support her children while they were in the Department's custody.

Mother admitted that, during the year and seven months that she was using drugs, it would not have been a good thing for her children to be with her. After she got her visits back, she was allowed to see the children for eight hours each month. Then, she failed a drug screen and lost her visits for a period of time.

Mother testified that she believed a DCS caseworker suggested rehab when she first lost custody of her children, but she did not go at first. She felt that she was "in shock" after losing her children in April 2015; she went to rehab in July 2015. Mother further testified that, after her most recent relapse, another caseworker asked if she wanted to go to rehab, but Mother "told her that I didn't because I'd been recently, and I was—rehab isn't what I needed." Mother testified that she completed frequent drug screens in Rutherford County and that she had not failed a drug screen since the hair follicle test in July 2017.

Mother testified that she recalled being told that she had an obligation to support her children while they were in DCS custody and that her rights could be terminated if she did not fulfill that obligation. She stated that she was ordered to pay $60.00 a week for the two children at issue in this case. Mother stated that she had worked at several jobs since the children had been in custody. From November 2016 to January 2017, she worked for UPS. In February 2017, she worked for about a month for ASDT doing hotel jobs. From March to July 2017, Mother worked at Universal, a company that contracted with Nissan. In September 2017, she began working for Fairfield Inn as a housekeeper, and she was still working in that job at the time of the hearing. Before these jobs, Mother testified, she was using drugs and sold drugs to make money.

According to Mother, once she started working at Fairfield Inn, she called both counties to let them know they could have child support automatically deducted from her pay checks. The automatic deductions had not started at the time of the hearing. Mother estimated that she last paid child support for Kimberly and Larry in June and July 2017, when it was automatically deducted from her paycheck. She did not believe she paid any child support in 2015.[3] Mother admitted that, during the four months preceding the filing of the termination petition in June 2016, she had not paid any child support. She further admitted that, during that time period, there was nothing physically preventing her from working.

---

[3] Records from the State of Tennessee Child Support Division show that Mother made payments on child support in November 2016 and in January, February, May, June, and July 2017.

At the time of the hearing, Mother was living at Doors of Hope, a halfway house for recovering addicts, where children were not allowed to live. She testified that she was just beginning to look for permanent housing. She and her caseworker had prepared a budget, and she was working on lowering her child support obligation on Evelyn, lowering her probation and driver's license fees, and obtaining a driver's license. According to Mother, she attended intensive outpatient programs ("IOPs") on Monday, Tuesday, and Thursday. She had to attend twenty IOPs because she was required to redo a drug and alcohol reassessment. On Friday nights, Mother went to Celebrate Recovery, where she had recently completed all twelve steps. On Wednesday nights, she participated in Last Call 4 Grace, a service program. Mother testified about her small church and all of her activities there, including leading a new Celebrate Recovery program for youth.

Mother acknowledged that she was participating in Celebrate Recovery at Right Road before her relapse, but she explained that she had not been going very often. At that time, she was working at night. Mother testified: "It wasn't until like that relapse that I actually started working the program." Now, she was going seven days a week and actually participating. Mother stated that this would be "a lifelong thing."

Asked about her progress on the permanency plan, Mother testified that she completed the A&D assessment and parenting assessment. She stated that she did not recall receiving any help with housing from her DCS caseworker.

Mother testified about her history with drugs and alcohol. She estimated that she started drinking occasionally when she was thirteen and that her husband introduced her to opiates. After her mother passed away, she started drinking "quite a bit." After her husband died, "it just, like, progressively got way worse." Mother's husband died from drug use. Mother gave the following testimony regarding what she had learned to expect about recovery:

> They say that insanity is doing the same things over and over again expecting different results. Well, if that were true, then what would the definition of sanity be? Sanity is making sound decisions in a stable mind. I love looking words up. So insanity is making unstable decisions that do not make sense. My mind had been trained to, I feel this pain, let me make it better. And it even got to a point where, I feel this pain, I know this is not going to make it better, it's going to make it worse, but I'm still going to do it anyways. That is insanity.
>
> And, man, the things I've learned. And especially this last—these last few months have been beautiful. It's been hard, but it's been beautiful. But I have—everything is God, the reliance I have on him, the trust. I can feel my emotions again. I cry happy tears now, which is crazy. And I hate

that it has taken me this long to finally get it. But through every relapse, I've learned something. And if getting clean was the hard part—and it is hard to get clean, to actually stop—there wouldn't be many addicts in the world. But it's staying clean. And I did drugs, but drugs was not my problem. I had a problem underneath all of that, and that is—I've been able to let it go, and I'm working through it. I see a therapist once a week, and I'm able to get through that.

My kids was like a Band-Aid to me. Like they was all I had, and I knew I had to maintain because I had them. And so when I lost them, it didn't make sense to me, but I got worse. I got worse, way worse, because I didn't have—I didn't have anything. I couldn't see it. I couldn't see far enough ahead to stop. I just knew my reason to take a breath was gone.

Mother testified that she felt that she had "been delivered" from her addiction and that she was capable of being a good mother. She stated that she continued to have a strong bond with the children. When she was asked how long it would be before she would be in a position to provide a stable home for them, Mother testified that she thought she could find a place to live in a few months.

On cross-examination, Mother stated that she obtained the suboxone and methamphetamines that caused her relapse from her sister, Tabitha Williams. She was living with her sister at that time. According to Mother, she ended her relationship with Bryan L. the day they were arrested in August 2016. She had been convicted for aggravated assault and sentenced to six years of probation as a result of that arrest.

Mother stated that she entered a rehab program with Buffalo Valley in 2015, and then entered a halfway house in Lebanon for two months. But, when she left the rehab, she started using drugs again. She also went to rehab programs at Right Road several times and The Next Door. She was working the third shift seven days a week, was feeling a lot of stress, and could not see her children. Mother testified that, "I think it just started getting overwhelming, and I eventually gave in to it." Using drugs was her way of coping with stress.

Mother admitted to the court that she was not currently in a position to have her children live with her. She stated that she had gotten her sobriety three months earlier and that she could not "imagine sticking a needle in [her] arm again."

The Department's next witness was Elizabeth Brown, a DCS family service worker in Rutherford County. Ms. Brown was Mother's case manager for Evelyn, the child in custody in Rutherford County. She had been in communication with the Wilson County case worker regarding Mother's progress in her case regarding Larry and Kimberly.

Ms. Brown testified that she was assigned to Mother's case on February 22, 2017. She first performed a random drug screen on Mother on March 15, 2017, and Mother passed. Ms. Brown testified that, since she began screening Mother, Mother had not failed a drug screen. Mother was living at a re-entry home, which was not a place where children were permitted to live. As part of her permanency plan, the Department required Mother to submit to random drug screens, visit consistently with Evelyn, follow probation rules, attend counseling, complete an A&D assessment and follow recommendations. According to Ms. Brown, Mother had either completed all of these requirements or was in the process of doing so.

Ms. Brown verified that Mother's case in Rutherford County was for severe abuse and also involved Bryan L., Evelyn's father. The Department was working with Bryan L., as well as with Mother, and Ms. Brown was aware that there was a no-contact order between Bryan L. and Mother. She was aware that Bryan L. and Mother had some contact while he was incarcerated (during DCS parent visits at the jail), and she believed that Bryan L. contacted Mother several times after his release. Mother and Bryan L. were no longer in a relationship, according to Ms. Brown.

On cross-examination, Ms. Brown testified that Mother had been cooperative with her throughout the permanency plan process. Ms. Brown stated that she assisted Mother with housing and other items on the permanency plan. With respect to housing, Ms. Brown had called different apartments on Mother's behalf, "[b]ut because she has a felony on her record, it's hard to find her housing." Ms. Brown also helped Mother develop a budget. She acknowledged that, paying child support for three children, Mother did not have adequate income to pay rent and other expenses. On redirect, Ms. Brown responded in the affirmative to a question suggesting that Mother would be short about $500 if she were to pay all of her monthly expenses with her current income. Then, on recross, Mother's attorney asked: "And don't you imagine [the children's benefits from their father's social security account] would probably take her out of the negative real quick?" Ms. Brown answered in the affirmative.

Duwana B., Mother's older sister, testified on Mother's behalf. She had seen the children every other weekend when they were at James K.'s house. Duwana lived across the street from her and Mother's father, James K. Asked about the foster parents, she stated that "they have a pretty loving home." Although Duwana was not happy with the circumstances and was bitter when Kimberly and Larry were first placed in foster care, she testified that "Shane and Michelle have been very good providers for them, not only with material things but, you know, emotionally as well." She had observed that the children had "a pretty close relationship with [their foster parents]." Duwana felt that the children were "doing very well under the circumstances."

As to the children's relationship with their grandfather, Duwana observed that "Kimberly likes to pick a lot on him," and that "Larry can be a little more trying

- 7 -

sometimes . . . I mean, just a typical boy . . . ." Overall, she felt "they do have a good relationship with my dad." She had not seen anything that caused her concern.

When Mother was caring for the children in the past, Duwana did have concerns. She felt that Mother "had a lot of hurt that she didn't know how to express, and she turned to drugs to just, I guess, basically survive her hurt." Mother's husband died of a drug overdose, and Evelyn's father was a drug user.

The second day of the trial began with the testimony of James K., the children's maternal grandfather. Before the children were in DCS custody, they were in James K.'s care for about six months on two separate occasions. Mr. K. described Larry's behavioral problems. He stated that, when Mother first came to court, she was not disciplining the children. It was Mr. K.'s opinion that Larry's behavior had not improved. Larry had received between 72 and 74 write-ups at school that year alone. He had been suspended for a day.

Mr. K. testified that Mother "has done so much better in the past few months." She still did not have a place for the children to stay, but she worked every day and Mr. K. thought that things were getting better. He admitted that she had done meth again once, but he was proud of her; she had "come a long ways and she's proven a lot." James K. stated: "She's doing a lot better, but there's still more to go."

Mr. K. opined that Larry was not as happy with the foster family as Kimberly was. He suspected that Larry's reticence regarding Shane, the foster father, stemmed from an incident early in the children's time in the foster home when the foster father allegedly raised his voice at Larry and used profane language. The Department was informed of the incident, and someone from the Department spoke with the foster father about it. Mr. K. stated that he had never seen any actions on the part of the foster parents to make him think they did not love the children.

On cross-examination, Mr. K. was asked what changes he had seen in Mother since she first began coming to court. He stated that she now admitted she had a drug problem, had a job, and paid child support for Evelyn. As to potential problems, Mr. K. stated that a place to live and transportation could be difficult. Mother was probably not going to have a job making a lot of money. But she could be a mother.

Foster mother Michelle J. testified that Kimberly and Larry had been living with her and her husband since July of 2015. She stated that, when the children first came to live with them, they were quiet and subdued. Larry was "more physically aggressive" in the first few months, whereas it was hard for Kimberly to open up. The children fought frequently in the beginning. When Larry acted out physically, it was usually against Kimberly. Michelle testified that Larry's physical acting out had improved, and Kimberly had learned some karate defensive moves to get Larry off of her. The family

would have discussions around the dinner table about daily activities and things to work on. After about a year, she and her husband noticed significant improvements regarding Larry's physical treatment of Kimberly; but he was still "pretty negative" verbally and emotionally. The foster parents worked with Larry about how to speak to his sister and how to treat other people.

Michelle testified that the children received weekly therapy services through LifeCare. She and her husband also talked to the therapists individually before or after the therapy sessions and were sometimes involved in the sessions. There had been times when Larry was verbally or emotionally abusive toward his foster parents. A few weeks earlier, he had gotten in trouble at school for being disrespectful to a couple of teachers, and then to the principal. He was suspended from school for a day. After several days, Larry admitted to Michelle that a child at school had made him mad. Instead of talking to the teachers, he acted out.

Michelle stated that she and her husband loved the children "completely and utterly." They told Kimberly and Larry that they did not always like the choices that the children made, but "[w]e're going to love you anyway."

According to Michelle, once the children resumed contact with Mother, "Larry really started with the disrespect." She thought that Larry was afraid of being disloyal to Mother so he felt he needed to put the foster parents "in their place." Kimberly started having nightmares after the visits with Mother started; she was also "extra clingy" after the visits. Michelle added that the family was about to begin receiving family counseling services through Youth Villages. The focus of the counseling would be on Larry's disrespect and anger issues. If the court decided to terminate Mother's parental rights and permit the foster parents to adopt them, Michelle and Shane intended to allow the children to maintain contact with Mother, Mr. K., and their other biological family members.

The foster father, Shane J., testified that the children had lived with him and his wife for about two-and-a-half years. He stated that it was "really rough" with Larry for the first six or seven months, but things had gotten better over time. When asked to describe the problems exhibited by Larry, Shane stated: "Insubordination, kind of; disrespect; and some fighting, mainly with his sister." The techniques employed by Shane and his wife included trying to be consistent and rational with him and talking about consequences. They did "the write-off"[4] when Larry got into trouble at school and told Larry that there were open lines of communication between the teachers and the foster parents.

---

[4] The write-off is part of the disciplinary system used at Larry's school.

As to the children's behavior in the foster home currently, Shane stated that some of the same issues persisted. Both children told lies at times. They had gotten better with regard to fighting with each other over the past six months. Both children attended weekly individual therapy. The family was about to begin at-home intensive therapy, which came about mainly as a result of Larry's disrespect toward teachers and others at school. Shane thought that Larry had shown more issues with disrespect at school that year than in previous years. Shane testified that he and Michelle continued to use write-offs and taking electronics away to discipline the children.

Shane testified that he and Michelle were committed to parenting the children and were "completely in." They love the children and have taken them to visit their families. If possible, Shane and Michelle intend to adopt Larry and Kimberly.

The next witness was Jessica Reese, a DCS family service worker who had been the children's caseworker since June 2, 2017. As part of her duties as the children's caseworker, Ms. Reese maintained their records in "TFACTS" (Tennessee Family and Child Tracking System) and was familiar with the records concerning their case prior to becoming their caseworker. She stated that Mother failed a hair follicle drug test on August 3, 2017, and thereafter admitted to using methamphetamines. Mother had been suspended from a halfway house for alcohol consumption and was living with her sister at the time. She admitted getting the drugs from her sister, Tabitha Williams.

When Ms. Reese took over the children's case, DCS had already filed a petition for termination against Mother. She testified that Mother still needed to complete tasks required by the permanency plan: "[H]aving employment was still an issue, housing was still an issue." At the time of the hearing, Ms. Reese stated, Mother was living in another halfway house where the children could not live; the hope was that Mother "will have housing, possibly the springtime." There was no definite date when Mother would be able to transition to independent housing. Ms. Reese stated:

> From my understanding, there are houses that the City of Murfreesboro has purchased for this program and women are able—once they complete Doors of Hope, they can move into the home for a period of two years. They still have rent and other responsibilities, but it's lower than what your average three-bedroom house would be to rent.

According to Ms. Reese, the rent for these houses would be $500 a month.

Ms. Reese testified that the Murfreesboro DCS office helped Mother complete a budget, which included a rent of $400. Mother was in the red on the budget, even with a rent of $400. The cost of having Larry and Kimberly in her household was not included in that budget, but it did include child support payments for Evelyn of $120 a month.

- 10 -

The deficit in the budget was over $600, according to Ms. Reese, so taking out the child support payments would not be enough to balance the budget.

As to employment, Ms. Reese stated that she had received verbal confirmation that Mother worked at Fairfield Inn in Murfreesboro. Ms. Reese had requested pay stubs from Fairfield Inn but the hotel said it did not have pay stubs. The budget showed Mother's income to be $650 plus $100 for food stamps.

Asked whether there were other tasks that Mother needed to complete, Ms. Reese testified that, when Mother relapsed, Ms. Reese had arranged an A&D assessment, which then recommended that she complete IOPs. Mother received authorization for twenty sessions through HealthConnect America, but only five were completed. A second authorization was provided, and Mother completed only seven sessions. Mother told Ms. Reese that she had attended sessions on three days of the month of the hearing and that she had a certificate of completion form. There had been no authorization, however, so Ms. Reese needed to follow up on the IOPs. Otherwise, there were no other assessments outstanding for Mother to complete.

Ms. Reese verified that Mother had started therapeutic visitation in January 2017, which usually consisted of eight hours a month. For the most part, Mother had been seeing the children for six to eight hours a month, with the exception of the months after she had a positive drug screen. As to child support, Mother paid child support for Larry and Kimberly in June and July 2017, but Ms. Reese did not think she paid anything after that.

According to Ms. Reese, the foster parents were loving people. They had fun with the children, "but they'll be stern with them when they have to be. They seem happy." She noted that Larry had caused more tension in the household, especially around September 2017. She had talked to the foster parents about additional services, and they had agreed to have comprehensive child and family treatment in the home three times a week to "work with Larry individually on issues with disrespect, abiding by the rules" and to "work with the family as a whole to try to repair some of that relationship between Kim and Larry." Ms. Reese opined that the foster children were bonded with the foster parents.

Ms. Reese stated that it was not confirmed that there would be space available for Mother to live in the housing provided by the City of Murfreesboro in the spring of 2018, and it was not known if she would be able to afford the housing. Ms. Reese did not know what would happen if Mother was not able to afford moving to the transitional apartments.

As to other concerns regarding Mother, Ms. Reese testified as follows:

[W]e all have to recognize that she's come a long way. But at this point, we're four months out from a relapse. Housing is still – I mean, that potential is there but we don't know what that's going to look like when the time actually comes. The kids have just been in limbo for so long and I realize there's really no winning situation here, because those kids have lost a thousand times over at this point. . . . [N]ot being able to see mom and just all the ups and downs, they've really been through the ringer. And that's – actually my concern is for that not to continue in any amount.

She stated that the children had received counseling services regarding the adoption process and would continue to receive such services if Mother's rights were terminated.

Mother's HealthConnect certificate showed twenty sessions between October 9 and December 20, 2017, which was the number of sessions required, but the sessions did not take place within the required time frame. Ms. Reese would have to verify that Mother met the IOP requirement with this certificate. If so, the only outstanding permanency plan requirements would be the provisions of pay stubs for employment and satisfactory housing.

Ms. Reese testified that Larry's issues with disrespect and defiance began in January 2017 and "really kind of exploded" in September. The children began having visits with Mother in January 2017. In September 2017, the termination trial was about to start.

Mother took the stand again on her own behalf at the end of the trial. She explained the problems she had experienced scheduling IOP sessions through HealthConnect around her work schedule. She brought with her to the hearing copies of her pay stubs from Fairfield Inn, where she worked as a housekeeper. Child support was taken out of her pay check. Mother stated that she typically worked six days a week. She had not yet figured out childcare. Now that she had completed her IOPs, Mother planned to work on a schedule and look for options for childcare as well as other job opportunities.

Mother was asked about her multiple stints in rehab and relapses. She testified that, when she went to trial in Rutherford County on charges of severe child abuse (for taking drugs while pregnant with Evelyn), she did not contest the findings. She stated: "I know I was wrong; I'm taking responsibility for my mistakes." She admitted, when asked by the court, that she was not in a position that day to take custody of her children. Furthermore, Mother testified that, when the termination petition was filed, she was not in a position to take custody of the children because she was still struggling with drugs.

In an order entered on February 12, 2018, the trial court concluded that Mother's parental rights should be terminated and that termination was in the children's best interest. The court determined that the following grounds were established by clear and convincing evidence: abandonment by willful failure to visit during the statutorily relevant period, abandonment by willful failure to support during the statutorily relevant period, and persistence of conditions. The court found there was not clear and convincing evidence to prove the other two grounds alleged by the Department: abandonment by failure to provide a suitable home and substantial noncompliance with a permanency plan. The trial court's findings of fact and conclusions of law will be discussed below as relevant to the issues raised on appeal.

STANDARDS GOVERNING PARENTAL TERMINATION TRIAL PROCEEDINGS
AND APPELLATE REVIEW

The Tennessee Supreme Court has described the appellate review of parental termination cases as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

The termination of a parent's rights is one of the most serious decisions courts make. As the United States Supreme Court has said, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). "Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005),

and of "severing forever all legal rights and obligations of the parent or guardian." Tenn. Code Ann. § 36-1-113(l)(1).

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995) (citing *Hawk v. Hawk,* 855 S.W.2d 573, 577 (Tenn. 1993)). This right "is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d at 521 (citing U.S. Const. amend. XIV, § 1; Tenn. Const. art. 1, § 8). Although this right is fundamental, it is not absolute. *Id.* at 522. The State may interfere with parental rights only in certain circumstances. *Id.* at 522-23; *In re Angela E.*, 303 S.W.3d at 250-51. Our legislature has listed the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists, *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "'Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings.'" *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted)). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). As a reviewing court, we "must 'distinguish between the specific facts found by the trial court and the combined weight of those facts.'" *In re Keri C.*, 384 S.W.3d 731, 744 (Tenn. Ct. App. 2010) (quoting *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007)). Then, we must determine "whether the combined weight of the facts . . . clearly and convincingly establishes all of the elements required to terminate" a party's parental rights. *Id.* (citing *In re Tiffany B.*, 228 S.W.3d at 156, and *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004)). "When a trial court has seen and heard witnesses, considerable deference must be accorded to the trial court's findings as to witnesses' credibility." *Id.* (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

Once a ground for termination is established by clear and convincing evidence, the trial court or the reviewing court conducts a best interest analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005), and *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

ANALYSIS

The only issue raised by Mother on appeal is whether the trial court erred in finding that it was in the children's best interest to terminate her parental rights. Our Supreme Court has ruled, however, that, "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26. We will, therefore, determine whether each ground upon which the trial court based its decision is supported by clear and convincing evidence and whether terminating Mother's rights is in the children's best interest.

I. Grounds for Termination

A. Abandonment by Willful Failure to Visit

Tennessee Code Annotated section 36-1-102(1)(A)(i) (June 2016)[5] defines abandonment as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

The Department alleges that Mother abandoned the children by failing to visit them during the four months prior to the filing of the petition to terminate on June 29, 2016.

---

[5] We reference the versions of the statutes in effect at the time when the Department's petition was filed on June 29, 2016.

As to this ground, the trial court made the following findings of fact and conclusions of law:

> The Department filed its Petition for Termination of Parental Rights on June 29, 2016. During the preceding four (4) months, the mother willfully failed to visit with the children, despite visitation being available to the mother and DCS attempting to contact the parents to set up visitation. The Department made diligent attempts to explain the consequences of the mother's failure to visit with the children and to apprise them of their access to visitation. The Respondents knew that their children were in DCS custody as the mother had attended previous court hearings in the underlying dependency and neglect case, mother was given paperwork which stated the Criteria and Procedures for Termination of Parental Rights, as well as other court orders and documents that contained language indicating the consequences of a parent's failure to visit and/or support his or her children. Mother was approved to have therapeutic visitation with the children contingent upon passing three consecutive drug screens and she either did not make herself available for drug screens or did not pass drug screens during this time frame, which prohibited her from having contact with the children.
>
> . . . .
>
> During the relevant statutory time period of February, 2016, to June, 2016, the mother had no visitation with the children. Mother's visitation was to be therapeutic and contingent upon her ability to pass three consecutive, random drug screens. Mother was aware of this requirement, however, she did not make herself available for the visits and was unable to pass the necessary drug screens. DCS had set up the therapeutic visits, so mother only needed to pass her drug screens in order to exercise her visits. Additionally, mother was aware or should have been aware of the consequences of her failure to visit with the children as she was provided with numerous documents explaining these consequences. Mother did not visit the children during the requisite period, knew or should have known the consequences of failing to visit, and was made aware of the requirements before she could have visits, however, as she did not comply with the requirements, with good reason, and did not have visits with the children during the four month period.
>
> Accordingly, the Court finds by clear and convincing evidence that the Respondent abandoned the children by willfully failing to visit with the children during the statutorily relevant period.

This Court has previously held that, "A parent's choice to continue to use drugs when the parent is prohibited from visiting a child until passage of a drug test constitutes

- 16 -

a willful failure to visit the child." *In re Morgan S.*, No. E2009-00318-COA-R3-PT, 2010 WL 520972, at *9 (Tenn. Ct. App. Feb. 12, 2010). Mother does not contest the trial court's findings or conclusions of law with regard to this ground. We have determined that the evidence does not preponderate against the trial court's findings of fact and that those facts constitute clear and convincing evidence to support the ground of abandonment by willful failure to visit by Mother in this case.

B. Abandonment by Willful Failure to Support

Tennessee Code Annotated section 36-1-102(1)(a)(i), quoted above, also defines abandonment to mean that a parent has "failed to support or [has] failed to make reasonable payments toward the support of the child" during the four months preceding the filing of the petition for termination of parental rights. The Department alleges that Mother abandoned the children by failing to pay child support for them during the four months prior to the filing of the petition to terminate on June 29, 2016.

As to this ground, the trial court made the following findings of fact and conclusions of law:

> During the preceding four (4) months prior to the filing of the Termination Petition, mother also willfully failed to support the children. Mother testified that she was not disabled, that she was aware that she was ordered to pay child support, and that she either was working or had the ability to work when she was not working, however, she failed to give an adequate reason as to why she did not financially support the children during that period. Mother did testify that she had made some child support payments after the four (4) month period, however, she admitted she did not make any payments during the requisite period. Mother knew or should have known of the consequences of her failure to support the children financially as she was provided information that informed her of the consequences of her failure to financially support the children. Mother also admitted that she was aware of her duty to pay support for the children.
> . . . .
> During the relevant statutory time period of February, 2016, to June, 2016, the mother did not financially support the children. As evidenced by the records from the child support office as well as mother's own admissions, she did not pay any support for the children during that time period. Mother testified that she was working during some of that period and when she was not working, it was not due to any disability or incarceration. Additionally, mother was aware or should have been aware of the consequences of her failure to support the children as she was provided with numerous documents explaining these consequences. Mother did [not] support the children during the requisite period, knew or

- 17 -

should have known the consequences of failing [to] support them, and was not incarcerated nor disabled during the four month period to prevent her from supporting the children.

Accordingly, the Court finds by clear and convincing evidence that the Respondent abandoned the children by willfully failing to support the children during the statutorily relevant period.

The Department must prove that Mother's failure to pay was "willful." Tenn. Code Ann. § 36-1-102(1)(A)(i). Failure to support is willful "when a person is aware of his or her duty to . . . support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d at 864. Mother testified that she was aware of her duty to pay child support for her children. She further stated that she worked during part of the relevant time period and that, when she was not working, it was not because she was disabled or unable to work. Furthermore, Mother admitted that she failed to pay child support during the four months prior to the filing of the termination petition. The evidence does not preponderate against the trial court's findings of fact, and we conclude that those facts constitute clear and convincing evidence to support the ground of abandonment by willful failure to support by Mother in this case.

C. Persistence of Conditions

The requirements for termination of a parent's rights under the ground referred to as "persistence of conditions" are found in Tenn. Code Ann. § 36-1-113(g)(3)(June 2016):

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

The Department argues that the conditions that led to the children's removal from Mother's home in April 2015 still exist, and that other conditions have arisen that prevent the children's safe return to her home. The Department further asserts that these

conditions are not likely to be remedied at an early date, and that the continuation of Mother's relationship with the children prevents them from integrating into a safe and permanent home.

The trial court made the following pertinent findings of fact and conclusions of law regarding this ground for termination:

> The children were removed from the mother's home due to issues with her drug use. The mother had an extensive period throughout this case where she continued to abuse drugs and admitted that she refused help from DCS and others for an extensive period of time. DCS made reasonable efforts in assisting the mother in rectifying the conditions that led to the removal of the children from the home, however, during a majority of this case, mother was still using drugs, used drugs to the point where she had another child that was born who was removed from mother's custody in Rutherford County, Tennessee, due to this child being born with drugs in her system from mother using drugs while pregnant, and mother's admission that she had relapsed since the TPR had been filed, including her use of methamphetamine. Mother has stated that she is sober since relapsing and that relapsing is part of recovery and that she is very involved in recovery-based groups, however, she has used drugs for a majority of this case to the point where these conditions have persisted throughout the case and are not likely to be resolved any time soon.

> The children have been in the custody of DCS since June, 2015, and before that, were living with their grandfather. The children were removed from their mother's home due to concerns that the mother was abusing drugs.

> The conditions that led to removal still persist as to the mother. Before this Termination Petition was filed, mother was not passing drug screens and not availing herself to the Department to consistently take drug screens. By mother's own testimony, she was actively using drugs throughout this case. After this Petition was filed, mother began to live a more sober lifestyle, however, she had recently relapsed before this hearing and was discharged from a drug treatment program due to her relapse. DCS had made reasonable efforts to assist mother in curbing her drug use, however, until recently, she was consistently abusing drugs. There is little chance that mother will be able to rectify her conditions in the immediate future as mother has not consistently shown she can stay sober and even after a period of sobriety, she has relapsed. Due to this patterned drug use, the Court finds it is unlikely that these conditions will be likely remedied soon. Additionally, the relationship between the mother and the children is

- 19 -

diminished and suffers as a result of mother's inconsistent ability to remain sober.

Accordingly, the Court finds by clear and convincing evidence that the conditions that led to the removal of the children from the mother still [persist] and that this ground has been satisfied for the purposes of termination of parental rights.

The evidence does not preponderate against the trial court's findings of fact, and we have determined that those facts constitute clear and convincing evidence to support the ground of persistence of conditions as a ground for termination of Mother's parental rights in this case.

## II. Best Interest

Having determined that clear and convincing evidence of at least one statutory ground exists to terminate Mother's parental rights, we must next consider whether the trial court properly determined that termination of Mother's parental rights is in the best interest of the children. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a ground for termination, the child's interests diverge from those of the parent and the court focuses on the child's best interests. *In re Audrey S.*, 182 S.W.3d at 877. A court must view the child's best interest from the perspective of the child, not that of the parent. *Id.* at 878. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* at 877. Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in its best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555. Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

When considering whether terminating a parent's rights to a child is in the child's best interest, a trial court is to consider the following non-exclusive factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). A trial court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Although in some circumstances "the consideration of one factor may very well dictate the outcome of the analysis," *In re Audrey S.*, 182 S.W.3d at 878, a court is still obligated to consider "all the factors and all the proof." *In re Gabriella D.*, 531 S.W.3d at 682.

The trial court made the following findings of fact and conclusions of law regarding the best interest of the children:

The mother testified at lengths about how she loves the children and the children did state that they love their mother. The children's grandfather also testified that he loves the children and that the mother loves the children, however, he also stated that he would not allow mother's other child, whom he cares for, [to] live with the mother. The children's foster parents testified that they have encouraged and allowed the children to visit with their biological family, whom they have deemed appropriate. Additionally, the foster parents supported and cared for the children throughout all of the turmoil they have experienced in [this] case. The children have found stability in the [foster] home, who have indicated their desire to care for these children in perpetuity. The testimony from the

- 21 -

[foster] family has shown that the children have become an integral part of their family and the [foster family has] provided safe, stable, and loving care for these children.

. . . .

The children are in a loving, stable home that they have been in for years with the [foster parents], who have expressed their desire to adopt the children, if they are available to be adopted. The [foster] family has made the children an integral part of their family and has continued to develop the relationships between the children and their biological family in a manner that is safe and appropriate. Due to the mother's instability and patterned drug use, she is not a stable nor safe option for the children at this time and is likely not going to be that option any time soon. The children have been in the custody of DCS for years and need permanency. The children's only realistic option for said permanency is through adoption.

The Court therefore finds that termination of [Mother's] parental rights is in the best interest of the children.

In its findings, the trial court did not specifically address each of the factors listed in Tenn. Code Ann. § 36-1-113(i). As to factors one and two, Mother has failed to make an adjustment of circumstances to make it safe for the children to return to the home, and it remains unclear whether she will be able to make a lasting adjustment in the near future. As recently as August 2017, Mother had a relapse into drug use. Regarding factor three, the record shows that Mother was unable to see her children for over a year because of her drug use. In January 2017, she began having therapeutic visitation, but these visits were interrupted due to a drug relapse. While the testimony shows that Mother and the children love one another, they have not lived together or had overnight visits for over two-and-a-half years. Nevertheless, under factor four, they do have a meaningful relationship.

Factor five addresses the effect of a change in the children's caretakers and living environment. The children have lived with the foster family for over two years, in a safe and stable environment. Mother is not currently able to offer the children a stable home and, under factor six, she pled guilty to aggravated assault for her actions in taking drugs during her pregnancy with Evelyn. With respect to factors seven and eight, the evidence reveals that Mother has not maintained sobriety consistently enough to establish that she can provide a stable home for the children. As to factor eight, Mother has been providing child support for Evelyn, but has not provided child support for Larry and Kimberly on a consistent basis. According to the child support division records, Mother made only one child support payment in 2016 and five child support payments in 2017 for these two children.

As Mother argues, she has made positive steps towards making a lasting adjustment in her conduct. She has taken responsibility for her sobriety, and she has been attending therapeutic visits with her children. She has a job. Mother is not, however, ready to care for her children. She had a relapse as recently as August 2017. She lives in a halfway house where children are not permitted to live, and she is not prepared to provide housing and other necessities for her children. The evidence does not preponderate against the trial court's findings of fact, and those facts constitute clear and convincing evidence to support the trial court's determination that termination of Mother's parental rights is in the best interest of the children.

CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Tara A.P.


_____
ANDY D. BENNETT, JUDGE